Robert E. **HOLMES** and Carolyn S. Holmes, Petitioners–Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent– Appellee.**

Nos. 98–1286, 98–1295.

United States Court of Appeals, Sixth Circuit.

Argued March 16, 1999.

Decided July 1, 1999.

Elizabeth K. Bransdorfer (briefed), Jeffrey A. DeVree (argued and briefed), Mika, Meyers, Beckett & Jones, Grand Rapids, Michigan, for Petitioner–Appellants.

Gilbert S. Rothenberg, Donald B. Tobin (argued and briefed), U.S. Department of Justice, Appellate Section Tax Division, Washington, D.C., for Respondent–Appellee.

Before: KRUPANSKY, SILER, and BATCHELDER, Circuit Judges.

## OPINION

KRUPANSKY, Circuit Judge.

The petitioners-appellants, Carolyn S. Holmes ("Carolyn") and Robert E. Holmes ("Robert"), a married couple (collectively referred to as "the petitioners" or "the taxpayers"), have challenged the United States Tax Court's assessment of income tax deficiencies against them for each tax year 1987 through 1991 in the aggregate principal sum of $60,041.51, plus interest, as well as negligence penalties of $528.55 for 1987 and $763.53 for 1988, related to their claimed farming loss deductions. The petitioners, upon their Form 1040 joint personal income tax returns for 1987 through 1989, and their Form 1065 partnership income tax returns for 1990 and 1991,[1] had claimed deductions for losses incurred in operating a farm of approximately 165 acres where they resided and endeavored to grow Christmas trees for the commercial market, harvest timber, plant and cultivate row crops, and engage in the commercial husbandry of trout and catfish. Following audits, the Internal Revenue Service ("the I.R.S." or "the respondent") disallowed the entirety of the petitioners' aggregate $123,753 claimed farm loss deductions which were not otherwise excludable from income,[2] on the rationale that the taxpayers did not pursue those agrarian occupations with an actual and honest intent to earn profits. The I.R.S. further imposed the aforementioned additions to tax for negligence because the petitioners had mischaracterized a personal expense of $2,250 in 1987, and two personal expenditures in 1988 which totalled $765.30, as farm-related business expenditures.[3]

In February 1995, the Tax Court conducted a trial on the taxpayers' petition to set aside the I.R.S. deficiency assessments and negligence penalties. On December 2, 1997, it disallowed all deductions claimed by the petitioners as farm expenses incurred during the five tax years at issue, concluding that the petitioners had not

---

1. In 1982, the taxpayers formed R.C. Enterprises, a partnership through which they conducted real estate rental business. Commencing in 1990, the petitioners, upon the advice of their accountant Douglas Jackson, reported their annual farm income and expenses on their partnership income tax return (Form 1065) instead of their personal return (Form 1040).

2. The I.R.S. and the petitioners have stipulated the monetary amounts of the petitioners' gross income, during the years in controversy, traceable in the aggregate to their four agricultural activities (Christmas trees, row crops, timber, and fish). The petitioners earned total gross farming income (including government disaster relief, conservation, and/or other farm subsidy program assistance payments, as well as crop insurance proceeds) of $3,481 in 1987, $2,979 in 1988, $5,532 in 1989, $7,538 in 1990, and $11,174 in 1991. The taxpayers claimed a total of $237,522 in farm expenditures during the five year period in controversy. After subtraction of gross farm income, real estate taxes, and mortgage interest payments which the I.R.S. has conceded would have been legitimately deductible as Form 1040, Schedule A itemized expenses even if the taxpayers had not claimed to conduct agricultural activities for profit on their land, the petitioners have alleged net farm losses of $23,398 in 1987, $41,477 in 1988, $24,628 in 1989, $17,376 in 1990, and $16,874 in 1991, for a five-year total of $123,753.

3. It should be noted that, with the exception of the three erroneous minor deductions for which the Tax Court exacted negligence penalties, the petitioners' income and expense records were reviewed in the case *sub judice* principally to determine if they conducted their farming operations with the intent of earning a profit, as developed herein. Apparently, the respondent did not contest that, as a general proposition, the taxpayers had expended significant sums in furtherance of their farming endeavors. Accordingly, because the lower court did not have occasion to make specific findings regarding the propriety of most of the petitioners' other claimed farm expenses, this reviewing forum expresses no view regarding the adequacy of the petitioners' proof of the amount or character of any of their claimed farm expenditures, excepting the three deductions positively identified by the initial forum as mischaracterized, which are addressed *infra*. For purposes of this appeal, the cost figures provided by the petitioners are assumed to be accurate.

pursued their agricultural efforts with an honest intent to earn a profit. *See* 26 U.S.C. § 183(a) & (c) (mandating that, *inter alia*, with exceptions not at issue on this appeal, financial losses incurred by an individual pursuant to any activity "not engaged in for profit" shall not be deductible from gross income under either sections 162 or 212(1) or (2)).[4] The Tax Court also sustained the additions to the petitioners' taxes for 1987 and 1988.[5]

The trial record disclosed that, both prior to, and following, the operation of their farm and the cultivation of their farmland, Robert and Carolyn had been successful in vigorously pursuing various profit-generating employments and entrepreneurial activities. After earning a bachelor's degree in business administration with minor fields in economics and small business management, Robert was a salesman for State Farm Mutual Insurance Company in Battle Creek, Michigan from 1956 until 1961, when, in recognition of his sales leadership, his employer promoted him to district sales manager. In that capacity, Robert earned salaries ranging from $186,605.22 to $211,946 per year during the five tax years in controversy.

Additionally, prior to 1987, the petitioners participated as investors in a strip mall venture, the Holt Shopping Center. During the five year period at issue herein, the petitioners profited annually from that investment, in reported net sums ranging between $16,440 and $21,835 per year. Income derived from the retail mall included profits earned by a coin operated laundry which had been successfully installed and operated by Robert and his brother in law, despite their prior inexperience with that business. Beginning in 1990, Carolyn initiated a retail clothing enterprise, which yielded reported net income of $179 in 1991.[6] The record evidenced that, in each instance, the petitioners exhibited a common entrepreneurial pattern—upon identifying a potentially lucrative business, they investigated that business by consulting experts and self-study, assessed their likelihood of long-term financial success therein, and ultimately made informed prudent property acquisition and investment decisions which typically proved profitable.

4. The Internal Revenue Code of 1986, 26 U.S.C. § 162(a), generally defines deductible trade or business expenses as "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Section 212(1) and (2) direct that expenses incurred in the collection or production of income, or in the management, conservation, or maintenance of property held for the production of income, are generally deductible.

5. The respondent identified three specific expenses for which the petitioners had claimed farm expense deductions, but which in fact did not constitute agrarian outlays. The petitioners have conceded that a 1987 R.C. Enterprises check (no. 1004) for $2,250 payable to Chapman Nursery & Landscaping represented payment for ornamental landscaping which had been performed to enhance the appearance of the immediate area surrounding their residence on the farm. Carolyn had mistakenly journalized that personal expense as a farm expense. Additionally, the petitioners acknowledged at trial that two 1988 R.C. Enterprises drafts, for $455.68 (no. 1134) and $309.62 (no. 1215), executed to Brian Minto as compensation for work performed on a door at the taxpayers' summer cottage located at Higgins Lake, had been erroneously recorded by Carolyn as farm expenses. Provoked by those admitted irregularities, the Tax Court imposed negligence penalties against the petitioners totalling $528.55 for 1987 and $763.53 for 1988.

6. The taxpayers have also asserted that they consistently earned rental profits from their residential investment properties located in Florida. However, the R.C. Enterprises income tax returns of record, which covered only the tax years 1989, 1990, and 1991, did not segregate income and expenses associated with the petitioners' Florida holdings from those related to their Michigan rental properties, and thus it was not possible to determine whether their Florida properties were indeed profitable, because the pertinent Form 1065 for each year reflected a total net loss from "rental real estate activities." Thus, the Tax Court's rejection of the petitioners' conclusory testimony that the Florida residential units were profitable, in the absence of financial documentary corroboration, was not clearly erroneous. Fed.R.Civ.P. 52(a).

In the 1970s, the taxpayers purchased five acres of real estate in Calhoun County, Michigan. Consistent with his characteristically aggressive entrepreneurial *modus operandi*, Robert, motivated by obvious economic interests, attained adequate practical self-education of the construction trade, via reading, attending seminars, and consulting with local professional builders, to enable him to perform as the general contractor on the erection, on that property, of the petitioners' primary residence. In 1981, the taxpayers acquired an additional 40 acres contiguous to their extant five acre parcel, in the absence of any contemporaneous specific economic plans for that real estate except anticipated long-term value appreciation.

Shortly thereafter, however, the petitioners began exploring potential avenues of interim economic exploitation of that acreage. In 1983, utilizing a mechanical tree planter borrowed from the local Soil Conservation Office of the United States Department of Agriculture, coupled with spruce cultivation skills which he had developed as a youth while working on his father's spruce farm, as well as advice obtained from both the Department of Agriculture and a major Christmas tree wholesaler, Robert planted between 500 and 1,000 spruce trees on a section of this parcel for projected future sale during the Christmas season. In each subsequent year, Robert planted an additional several hundred to several thousand trees, overcoming his spouse's objections that, upon reaching maturity, those conifers would obstruct the view from their residence, by promising her that they would be harvested prior to attaining vision-obstructing heights. Because tending the spruces involved intensive labor, including pruning, shaping, fertilizing, and the application of herbicides and insecticides, Robert employed professional arborists to perform those services after 1983.

The petitioners had purchased spruce saplings for $120 or $130 per one thousand. Based upon industry data, Robert had anticipated ultimately selling mature spruces for between $2.00 and $2.50 per foot. Because no tree would reach the marketable height of five to ten feet for many years, the petitioners expected to incur substantial short-term financial losses on their Christmas tree venture, but foresaw significant long-term profit realization. Unfortunately, because irrigation of the petitioners' property would have been prohibitively expensive, recurring drought conditions in Calhoun County during the mid–1980s destroyed most of the taxpayers' pre–1988 spruce plantings. Although between 4,500 and 5,000 spruces survived and were growing on the petitioners' farm at the time of trial in 1995, no Christmas trees had yet been cropped for commercial sale. However, their counsel represented at appellate oral argument that the petitioners plan to begin harvesting trees initially planted in 1988 or 1989 during 2000.

In 1986, the petitioners purchased an additional 120 acres of land adjacent to their extant 45 acre estate in the expectation that, in time, its value would increase. The petitioners planned and initiated the implementation of cultivating row crops for commercial sale to produce interim income. In preparation for that undertaking, Robert consulted several local farmers, including Tim VandenHeede, who had previously farmed a part of the subject 120 acre tract. The crop history data and other pertinent information gathered by the petitioners indicated that row crop income could be expected to exceed the projected costs of labor, seed, and fertilizer. Although Robert personally performed some of the initial preparatory labor, he thereafter annually retained an experienced area farmer, Mike Robinson, to seed the land and tend the crops, at compensation fixed between $100 and $150 per acre.

In 1987, the taxpayers sowed 13.6 acres of corn and 10 acres of soybeans. Unfortunately, the severe drought that year destroyed most of those crops on nonirrigated farms in Calhoun County, including the

petitioners'. The taxpayers harvested 518 bushels of corn in 1987 but did not realize any proceeds from corn sales that year. They earned approximately $459 in 1987 from the sale of soybeans.

In 1988, Robert resolved to plant 15.3 acres of oats, upon Robinson's counsel that an oat crop might prove more successful than corn or soybeans under prevailing environmental conditions. Also following Robinson's advice, the petitioners purchased two 550 bushel grain bins to facilitate the long-term storage of crops for future sale when the market price for such grains rose to favorable levels. Additionally, Robert built a barn to warehouse farm equipment,[7] installed a gated fence to insulate his crops from his neighbors' errant livestock, and constructed a paved access road to his fields. Nonetheless, because of ruinous drought conditions and wild deer foraging, the entire 1988 oat crop was devastated. The petitioners reported, during 1988, the sale of stored corn harvested in 1987 for $432.

In 1989, the petitioners seeded 19 acres of corn and 13.1 acres of soybeans. Excessive rainfall during the growing season of that year inundated and destroyed the taxpayers' entire initial planting, which required a late-season replanting. The taxpayers ultimately derived 917 bushels of corn and 126 bushels of soybeans during 1989, but sold no produce that year, with the exception of $2,000 realized from the sale of hay and straw.

In 1990, the petitioners contracted with Robinson to plant 11.1 acres of corn, which yielded 164.1 bushels. That year, they earned $2,927 from corn sales. In 1990, because of chronic severe crop damage caused by grazing deer, Robert secured a permit from the Michigan Department of Natural Resources to hunt antlerless deer on his property. Although the petitioners did not plant any row crops during 1991,

the taxpayers reported $1,729 in income from the sale of warehoused grain that year.

At some point prior to the petitioners' acquisition of their farmland, a wooded section of their 120 acre parcel had been harvested for timber. After they purchased that tract in 1986, and continuing through 1988, Robert, with the occasional assistance of hired help, managed the forest, in accordance with his childhood arboreal training and experience attained by working at his father's tree nursery, by culling dead and undesirable trees and brush. Although Robert invested those efforts and expenses with an eye towards future timber harvests for profit, the petitioners sold no timber during the tax years at issue. Robert testified that he did not expect that his woodland would yield any harvestable timber for many years because of the timber cutting which had preceded his acquisition of the parcel.

Sometime prior to 1987, Robert read an article in *Michigan Farmer* magazine which described the technicalities, and profit potential, of farming fresh water fish in ponds for commercial distribution. Subsequently, Robert attended an educational seminar at the Michigan State Biological Station which addressed that activity. He learned that fry trout could be purchased for $1.75 to $2.50 each, and fry catfish could be acquired for $.10 a piece, whereas mature trout were marketable to area restaurants for between $2.50 and $4.95 per pound, and adult catfish were vendable for between $1.50 to $2.50 per fish. Robert also learned that proper water levels and temperature ranges were required to be maintained in the fish ponds.

In 1989, utilizing his newly acquired knowledge of piscine husbandry, Robert personally excavated and/or enlarged two ponds on the property,[8] lined their bottoms

---

7. The petitioners had acquired agricultural machinery and implements including a tractor, a plow, post hole diggers, rotary cutters, and sundry tools.

8. The trial record was uncertain as to whether Robert fashioned two man-made ponds, dredged and expanded two natural ponds, or

to prevent seepage, filled them with water, and stocked the smaller pond with 100 trout and the larger pond with an undisclosed number of catfish. Robert's initial attempt to raise fish failed because of that summer's harsh heat and drought conditions. In 1990, Robert restocked the two ponds and installed a pumping system for the periodic infusion of cool water to regulate water temperature during heat waves. The petitioners' fish sales from the two ponds amounted to $525 in 1990 before the failure of their pumping system which caused the heat-induced expiration of the remaining fish. Robert subsequently installed conduits and electric aerators in both ponds, built a deck leading to the center of the larger pond, installed a windmill and plunger system to draw cool subterranean water into one of the ponds, and inserted a pipe between the two ponds so that both might benefit from the temperature regulating system. Although the record did not disclose if the petitioners stocked any fish in either pond during 1991, the cost of their improvements amounted to $7,190.

In May 1990, during the course of an audit of the petitioners' 1987 and 1988 income tax returns, I.R.S. Revenue Agent Paul Przytulski visited the taxpayers' residence and farm. Przytulski testified that he observed "ornamental" or "nursery stock" plants as well as animal feed boxes near the ponds, deer tracks on the petitioners' terrain, and several salt licks, feed containers, and duck nesting boxes near their wooded area. The investigator also noticed, but did not speak to, men working in a tilled field on the petitioners' property. Another I.R.S. agent, Robert Cole, who visited the petitioners' farm in April 1992 in conjunction with his audit of their 1989 through 1991 income tax returns, surveyed their property by driving around its periphery with Robert and his accountant Douglas Jackson, without touring the entire farm. Primarily, Przytulski and Cole were dissatisfied with the supporting documentation provided by Jackson, which consisted of cancelled checks accompanied by invoices and receipts but unsupported by a formal systematic written reconciliation.

Carolyn maintained the books and records of the family farm, as well as their other business ventures. Following Jackson's advice, Carolyn utilized a one-write ledger bookkeeping system. Typically, upon receipt of a bill for a farm related expense, Robert would designate it as a charge for labor, machinery, or some other farm ledger classification. Carolyn would then execute a check in satisfaction of that debt, and record that payment in the corresponding ledger column. Carolyn sometimes wrote checks to discharge agricultural costs against their personal checking account, and on other occasions executed drafts against the R.C. Enterprises partnership account. The petitioners' response to the government's interrogatories revealed that their overall accounting practices were somewhat amateurish. The taxpayers' answer to the first interrogatory stated, in part:

> The petitioners salvaged some soybeans in 1987, and sold them for $459.00, but have not been able to find records to show the number of bushels or the price per bushel. The petitioners harvested some fish in 1990, and sold them for $525.00, but have not been able to find records to show the number of fish or the price per fish.... The petitioners salvaged some corn in 1988, and sold it for $423.00, but have not been able to find records to show the number of bushels or the price per bushel. The petitioners sold 787.2 bushels of corn in 1990, at prices of $2.41 and $2.48 per bushel, for a total price of $1926.88.

However, Jackson testified, without contradiction, that the petitioners' farm income and expense records were adequate to enable his preparation of their annual income tax returns. Additionally, he testified, as an accountant who prepared the

expanded one previously extant pond and created a second artificial pond.

income tax returns of many farmers throughout the area, that the petitioners' financial records of their agricultural business were at least as thorough and competent, if not superior to, most of his other farmer clients. However, the Tax Court credited the opposing testimony of Agent Cole that the petitioners' record keeping practices were "below average" as compared to those of other farmers whom he had audited.

Furthermore, the Tax Court, without resolving the sufficiency of the specific record proof in support of the petitioners' declared agricultural business expense deductions (except the three erroneously classified personal expenditures discussed herein), characterized the petitioners' claimed farm expenditures as categorically nondeductible, because it found that the petitioners did not conduct farming activities with an actual and honest intent to earn a profit. The Tax Court's disposition relied primarily upon its conclusion that the petitioners' business records were "generally unbusinesslike, careless, and sloppy," and that the petitioners derived some personal benefits from the operation of their farm.

■■■ On review, the Tax Court's factual findings, and inferences drawn from the facts, especially witness credibility determinations, are entitled to deference by the appellate court. *Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1166 (6th Cir.1996) (*quoting Anderson v. City of Bessemer*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). However, an appellate court may reverse a lower forum's factual finding for clear error when, even though the record contains some evidence in support of the finding, consideration of the overall evidence leaves

the reviewing court "with the definite and firm conviction that a mistake has been committed." *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602, 622, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Anderson*, 470 U.S. at 573, 105 S.Ct. 1504. By contrast, the Tax Court's application of legal standards, and its legal conclusions, are reviewed *de novo*. *Smith v. Commissioner*, 937 F.2d 1089, 1096 (6th Cir.1991).

■ The key question presented by the instant petition for review is whether the record supported the Tax Court's factual conclusion that the taxpayers failed to carry their burden of proving that they engaged in their arboreal, horticultural, and piscine labors and investments with the requisite section 183 profit motive. *See Hayden v. Commissioner*, 889 F.2d 1548, 1552 (6th Cir.1989) ("The threshold inquiry in determining whether an activity is a trade or business or is carried on for the production of income is whether the activity is engaged in for the primary purpose and dominant hope and intent of realizing a profit.") "In this context, 'profit' means economic profit, independent of tax savings." *Id.* "An activity is engaged in for profit if the taxpayer entertained an *actual and honest, even though unreasonable or unrealistic, profit objective* in engaging in the activity." *Campbell v. Commissioner*, 868 F.2d 833, 836 (6th Cir.1989) (emphasis added) (*citing 26 C.F.R. § 1.183–2(a))*.[9]

"In determining whether such a profit motive exists, a court must consider the objective facts and must also look to nine general factors set out in the Treasury Regulations." *Id.* Those factors are:

(1) the manner in which the taxpayer carried on the activity;

---

9. Treas.Reg. § 1.183–2 ("Activity not engaged in for profit defined") stipulates, in pertinent part:

The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Although a reasonable expec-

tation of profit is *not* required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit.

26 C.F.R. § 1.183–2(a) (eff. July 13, 1972) (emphasis added).

544

(2) the expertise of the taxpayer or his advisors;

(3) the time and effort expended by the taxpayer in carrying on the activity;

(4) the expectation that assets used in the activity may appreciate in value;

(5) the success of the taxpayer in carrying on similar or dissimilar activities;

(6) the taxpayer's history of income or loss with respect to the activity;  ·

(7) the amount of occasional profit, if any, which is earned;

(8) the financial status of the taxpayer; and

(9) whether the elements of personal pleasure or recreation are involved.

*Id.* at 836 n. 3 (*citing* Treas.Reg. § 1.183–2(b)). The *Campbell* court further observed that "[n]o one factor is controlling." *Id.*

■ The first factor relevant to determining if a taxpayer has pursued an occupation for profit is whether the taxpayer had acted in a businesslike manner in connection with that undertaking.[10] Despite certain deficiencies, the overall methods by ·which the petitioners carried on their agrarian activities were businesslike and revealed a profit motivation. Beyond controversy, the petitioners invested substantial efforts in their farm venture, including Robert's manual labor, educational pursuits, and consultations with arboreal, horticultural, and ichthyic experts. Additionally, the record disclosed that the taxpayers expended significant sums (purportedly $237,522 during the pertinent five tax years, including approximately $68,094 in actual out of pocket expenditures exclusive of real estate taxes and mortgage interest) in alleged further-

ance of their agricultural efforts, including the employment of experts and other contract workers. Although a confluence of inexperience and an inordinate stroke of meteorological adversities plagued the taxpayers' various ventures during the five tax years at issue, the record nonetheless mirrored their dedication to the development of their farm's pecuniary potential, in accordance with their experienced pattern of entrepreneurial success.

The petitioners displayed commercial tenacity by their obstinate pursuit of agricultural activities despite their initial failures. Moreover, they demonstrated a genuine desire to operate a remunerative enterprise by implementing practices to correct the causes of their failures, such as planting heartier oats instead of corn or soybeans, eliminating voracious deer, and regulating the water temperature in their fish ponds, among other progressive improvements. Furthermore, the petitioners evidenced the patience of prudent investors by rationally electing to incur consistent losses over several years in exchange for potential long-term gains, especially respecting their Christmas tree and timber activities. Even if the taxpayers' expectation of earning net income from farming was "unreasonable or unrealistic," it was nonetheless "actual and honest." *Campbell*, 868 F.2d at 836.

The Tax Court relied upon its characterization of the petitioners' financial books and records as inadequate, including a misallocation of three personal checks to the farm expense ledger, and their interchangeable use of either personal funds or partnership assets to discharge farm obligations, to support its finding that their farm was not managed in a "businesslike

**10.** The Code of Federal Regulations defines this criteria as follows:

> *Manner in which the taxpayer carries on the activity.* The fact that the taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit. Similarly, where an activity is carried on in a manner substan-

tially similar to other activities of the same nature which are profitable, a profit motive may be indicated. A change of operating methods, adoption of new techniques or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive.

26 C.F.R. § 1.183–2(b)(1).

manner." Despite the finding that the petitioners' business records were not maintained in accordance with professional accounting practices, the ledger of their family farm's revenues and expenses was nevertheless sufficient to enable them, their retained accountant, and the Internal Revenue Service to determine if the petitioners' farm was operating profitably or at a loss. Similarly, the identified erroneous accounting for personal costs attributable to landscaping and the installation of a door, at a time when the petitioners had retained laborers to perform agricultural services and construct farm structures, did not render the overall farm operation unbusinesslike. By the same token, the application of the taxpayers' personal funds and business partnership capital tended to evince that they were committed to make their farming venture productive. Their amateurish accounting practices, coupled with three isolated instances of misclassified personal expenses totalling $3,015.30 out of an aggregate alleged agribusiness expenditure in excess of $200,000, and the investment of both the taxpayers' personal and business partnership assets in the farm venture, did not negate the evidence, described in the record, of the petitioners'

fundamentally revenue-oriented arboreal, horticultural, and piscine occupations.

The I.R.S.'s second factor, "the expertise of the taxpayer or his advisors,"[11] patently favored the petitioners. Robert had acquired prior experience in the spruce and timber trades at his father's tree nursery; he pursued self-education, including consultations with experts, regarding each of the petitioners' four agricultural activities; and he employed a professional arboreal service to care for the spruce trees and contracted with an experienced local farmer (Robinson) to spearhead the row crop operation. The record disclosed, without contradiction, that Robert attempted to follow the advice of experts, the teachings of his self-education, and the counsel of his experience, in an effort to develop a productive commercial agricultural business. For those same reasons, matched with the prodigious physical labor invested by Robert in his farm, the Treasury Department's third factor, "the time and effort expended by the taxpayer in carrying on the activity,"[12] supported the mercantile design of the taxpayers' farm.

■ The I.R.S's fourth inquiry, "expectation that assets used in [the] activity may appreciate in value,"[13] also supported

---

**11.** The Treasury Regulation articulates the second material factor as follows:

*The expertise of the taxpayer or his advisors.* Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. Where a taxpayer has such preparation or procures such expert advice, but does not carry on the activity in accordance with such practices, a lack of intent to derive profit may be indicated unless it appears that the taxpayer is attempting to develop new or superior techniques which may result in profits from the activity.

26 C.F.R. § 1.183–2(b)(2).

**12.** The Treasury Regulation provides:

(3) *The time and effort expended by the taxpayer in carrying on the activity.* The fact that the taxpayer devotes much of his

personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. A taxpayer's withdrawal from another occupation to devote most of his energies to the activity may also be evidence that the activity is engaged in for profit. The fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity.

26 C.F.R. § 1.183–2(b)(3).

**13.** The regulation posits, in relevant part:

*Expectation that assets used in activity may appreciate in value.* The term *profit* encompasses appreciation in value of assets, such as land, used in the activity. Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an over-

the petitioners. Both Robert and Carolyn testified that they purchased their land with the expectation that it would increase in value, and that they elected to pursue agrarian production thereon in the meantime. Their infusion of personal physical commitment coupled with their pursuit of self education and professional expertise reflected an objective dedication to evolve the farming operation into a profitable business venture. Nevertheless, ignoring those objective manifestations developed by the evidence, the Tax Court concluded that because the petitioners had failed to prove that their farming endeavors and land had *actually* appreciated, they had not proved that, at the time that they acquired the subject property, they had actually and honestly expected that property to appreciate. To the contrary, the taxpayers needed only to prove a contemporaneous actual and honest expectation of value appreciation; they were not required to prove that a profit expectation was reasonably realistic at the time that they acquired their land, and thus *a fortiori* did not need to prove that the fortunes of time ultimately vindicated their prognostication.

all profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation.
26 C.F.R. § 1.183–2(b)(4) (emphasis in original).

**14.** The Treasury Department has recognized that financial success in *various* endeavors may evidence a·profit motive underlying the activities in question:

The success of the taxpayer in carrying on other similar or dissimilar activities. The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable.
26 C.F.R. § 1.183–2(b)(5) (emphasis added).

**15.** The Tax Court opinion conceded that "petitioners have been successful in several dissimilar business activities" including the shopping center and Carolyn's retail clothing distributorship, but erroneously accorded nonprobative significance thereto because their farming activities had been uniformly

Accordingly, the Tax Court facially misapplied 26 C.F.R. § 1.183–2(b)(4).

The fifth pertinent issue, "the success of the taxpayer in carrying on other similar or dissimilar activities,"[14] generally favored the petitioners' posture. As evolved, the record manifested that the petitioners had engaged in various financially successful risk ventures, including Robert's insurance career, the Holt Shopping Center and its coin operated laundromat, and Carolyn's retail apparel enterprise. The taxpayers pursued their farming operation with the same vision and indicia of success-orientation and entrepreneurial zeal as they did their other capitalistic vocations. The Tax Court misconstrued 26 C.F.R. § 1.183–2(b)(5) by focusing almost exclusively upon the petitioners' initial lack of success in their various agricultural pursuits, whereas the regulation unequivocally encompasses both "other similar *or dissimilar* activities."[15]

The sixth factor, "the taxpayer's history of income or losses with respect to the [subject] activity,"[16] as reflected by signifi-

unprofitable. Tax Court decision of September 10, 1997, pages 32–33 (J.A. at 54–55).

**16.** The controlling regulation propounds, as its sixth element:

*The taxpayer's history of income or losses with respect to the activity.* A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market conditions, such losses would not be an indication that the activity is not engaged in for profit. A series of years in which net income was realized would of course be strong evidence that the activity is engaged in for profit.

cant losses realized by the taxpayers' agrarian efforts during the tax years in controversy, did not warrant the weight of reliance accorded that evidence by the Tax Court when considered in light of the regulation that directs that ongoing customary start-up losses, and/or losses sustained by unforeseen or fortuitous circumstances such as drought or other adverse weather conditions, do not indicate the absence of a profit objective. 26 C.F.R. § 1.183–2(b)(6); *see, e.g., Nickerson v. Commissioner,* 700 F.2d 402, 407 (7th Cir.1983) (ruling that the taxpayer had proved a profit motive despite his expectation that many years would pass before his dairy farm realized net income). Beyond controversy, the instant record disclosed that the failure of the taxpayers' farm to yield profits during the tax years 1987 through 1991 was at least in part attributable to acts of God, namely inordinate periods of drought and heat which destroyed spruce trees, fish, and row crops. Moreover, the evidence reflected that wild deer depredation contributed to row crop losses, which Robert, beginning in 1990, had endeavored to alleviate by hunting deer on his property as authorized by his state game permit. Evidence that salt licks and feed boxes had been placed on the taxpayers' farm in no way proved the inherently absurd speculation that the petitioners had deliberately schemed to destroy their crops by attracting ravenous deer onto their farm. To the contrary, their activities could have been more logically construed to lure deer away from the crops, to areas where they could be easily hunted, thereby promoting the well being of the taxpayers' farm.

Nor is the seventh criteria of the Code of Federal Regulations, *i.e.,* "the amount of occasional profits, if any, which are earned," [17] detrimental to the petitioners' argument, because the absence of net earnings during the pertinent period did not negate the taxpayers' fundamental income-creating purposes, given that their fish and row crop losses were attributable to adverse acts of God, and their long-term spruce and timber industries were not expected to be commercially fruitful within the subject five-year duration. The eighth consideration of the Code of Federal Regulations, *i.e.,* "the financial status of the taxpayer," [18] is equally nondetrimental to the petitioners' position despite their sizable revenues from non-farming sources, because the existence of independent sources of wealth for the taxpayers will not automatically gainsay an otherwise proved actual and honest capitalistic motivation underlying a mercantile activity which in fact failed to yield economic gains for the taxpayers, especially if, as here, the tax-

---

26   C.F.R. § 1.183–2(b)(6).

**17.** The operative federal standard incorporated this proviso:

> *The amount of occasional profits, if any, which are earned.* The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent. An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. However, substantial profit, though only occasional, would generally be indicative that an activity is engaged in for profit, where the investment or losses are comparatively small. Moreover, an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated.

26   C.F.R. § 1.183–2(b)(7).

**18.** The controlling portion of the Treasury Regulation recites:

> *The financial status of the taxpayer.* The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved.

26   C.F.R. § 1.183–2(b)(8).

payers suffered actual out of pocket monetary losses in that undertaking, rather than mere paper losses manufactured to shelter unrelated income. *Ranciato v. Commissioner*, 52 F.3d 23, 26–27 (2d Cir. 1995).

The final factor, "elements of personal pleasure or recreation,"[19] did not negate the primary or dominant commercial attributes of the taxpayers' agribusiness. *See Godfrey v. Commissioner*, 335 F.2d 82, 84 (6th Cir.1964). Robert denied that he derived any entertainment or recreational benefit from his manual labor exerted to further his commercial spruce tree, timber reserve, row crop, or fishery efforts. *See Nickerson*, 700 F.2d at 407 ("Common sense indicates to us that rational people do not perform hard manual labor for no reason, and if the possibility that petitioners performed these labors for pleasure is eliminated the only remaining motivation is profit.") However, the Tax Court found that the petitioners' labors and expenditures on agricultural improvements and activities upon their 165 acre farm contributed to their use and enjoyment of their residence. That finding was unsupported by the record evidence.

The record reflected that Carolyn had objected to the planting of the spruce trees because they obstructed the view from the petitioners' residence; she agreed to that venture only after Robert promised her that the trees would be culled before they attained an obstructive height. No apparent augmentation of the taxpayers' use or enjoyment of their residence would result from Robert's efforts to remove dead or economically undesirable trees and brush from their timber grove, and no evidence indicated that they used their trees for any recreational purpose or other personal objective. The planting of row crops did not contribute to the aesthetic or ornamental enhancement of the petitioners' home, and those activities greatly exceeded the level of a mere backyard garden.

Robert's hunting of deer on his property for the stated purpose of protecting his agrarian investment, and the related placement of salt licks and feed boxes, did not reduce the petitioners' farm to a mere recreational hunting ground or private wild game reserve. Similarly, the introduction of feed boxes to attract waterfowl or other wildlife, and the presence of ornamental plants, near the fish ponds, did not conflict with those ponds' primary or dominant function of producing eatable fish for commercial distribution; nor did the occasional removal of some fish by members of the taxpayers' family for personal consumption render the fish ponds a mere personal hobby.[20] The paved roadway installed between the petitioners' residence and their tilled acreage may have enhanced the petitioners' opportunities for the personal enjoyment of their residential yard, however, it did not controvert that driveway's primary or dominant purpose to provide access to the crop fields for

---

19. The Treasury Department's standard included the following verbiage:

> *Elements of personal pleasure or recreation.* The presence of personal motives in carrying on of [sic] an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. On the other hand, a profit motivation may be indicated where an activity lacks any appeal other than profit. It is not, however, necessary that an activity be engaged in with the exclusive intention of deriving a profit or with the intention of maximizing profits. For example, the availability of other investments which would yield a higher re-

turn, or which would be more likely to be profitable, is not evidence that an activity is not engaged in for profit. An activity will not be treated as not engaged in for profit merely because the taxpayer has purposes or motivations other than solely to make a profit. Also, the fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors whether or not listed in this paragraph. 26 C.F.R. § 1.183–2(9).

20. Robert testified that he did not eat fish, nor did he enjoy recreational fishing.

economic purposes; the same can be said of the petitioners' fence and barn. The trial court's observation that some of the taxpayers' activities, investments, and real property improvements may have afforded them recreational or other personal benefit "opportunities" was irrelevant in the absence of proof, as opposed to speculation, that the petitioners actually derived substantial personal benefits therefrom which exceeded their proven economic motivations and interests.[21] The initial forum misapplied 26 C.F .R. § 1.183–2(b)(9), and committed clear factual error, by concluding that the petitioners had conducted their arboreal, horticultural, and ichthyic pursuits primarily for personal reasons as opposed to anticipated economic gain.

Indulging every supportable factual finding, inference, and credibility determination, expressly or impliedly made by the Tax Court in support of its instant judgment, this reviewing court is nonetheless compelled to conclude that, based upon the record evidence in its entirety, when assessed in conjunction with the nine Treasury Regulation guidelines enumerated above and other controlling authorities, the trial court's ultimate factual conclusion that the petitioners did not pursue agricultural activities with an actual and honest intent to earn a profit during the five tax years in controversy constituted clear error, and was infected by affiliated misapplications of governing law.

In summary, the trial evidence, when considered in its entirety, proved beyond contradiction that the petitioners possessed the legally requisite profit motivation, in pursuing their farming endeavors, to render legitimate costs sustained by the taxpayers or their business partnership, in furtherance of that business, deductible from gross income. The record did not support the conclusion that the taxpayers farmed "primarily as a sport, hobby, or for recreation," 26 C.F.R. § 1.183–2(a), or primarily to create a tax shelter, *Hayden,* 889 F.2d at 1552. The Tax Court clearly erred by focusing upon the petitioners' amateurish record keeping practices and the relatively minor potential personal benefits which they may have realized from their agricultural pursuits, and by unreasonably discounting the overwhelming weight of the supporting evidence of the taxpayers' economic productivity motivations; and further misconstrued the controlling law to the detriment of the petitioners. Accordingly, the judgment of the Tax Court is **REVERSED,** and the case **REMANDED** for further proceedings consistent with this decision.

Additionally, the Tax Court's imposition of negligence penalties against the taxpayers of $528.55 for 1987 and $763.53 for 1988 is **VACATED,** and the issue **REMANDED** for reconsideration in light of this decision. The Tax Court's finding that the petitioners had committed tax negligence[22] by erroneously claiming, as farm expenses, a deduction of $2,250 in 1987 for residential landscaping work, and a total deduction of $765.30 in 1988 for repairs to a door on their summer cottage, was not clearly erroneous, *see Westbrook v. Commissioner,* 68 F.3d 868, 880 (5th Cir.1995), and thus the Tax Court may exact negligence penalties from the taxpayers as mandated by the version of 26 U.S.C. § 6653(a) which controlled the specific tax year in question.[23] However, the

---

**21.** *See Faulconer v. Commissioner,* 748 F.2d 890, 901 (4th Cir.1984) (remarking that "gratification received from an activity is insufficient in itself to cause the activity to be considered not engaged in for profit.")

**22.** Tax negligence is "a lack of due care or a failure to do what a reasonable person would do under the circumstances." *Leuhsler v.. Commissioner,* 963 F.2d 907, 910 (6th Cir. 1992).

**23.** In 1987, that statute postulated:

(1) **In general.**—If any part of any underpayment ... is due to negligence or disregard of rules or regulations, there shall ·be added to the tax an amount equal to the sums of—
(A) 5 percent of the underpayment, and
(B) an amount equal to 50 percent of the interest payable under section 6601 with respect to the portion of such underpay-

Tax Court must recalculate the appropriate negligence penalties following its redetermination, in light of the instant ruling, of the petitioners' income tax underpayments for 1987 and 1988.

**IT IS SO ORDERED.**

ment which is attributable to negligence for the period beginning on the last date prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of assessment of the tax (or, if earlier, the date of the payment of the tax). 26 U.S.C. § 6653(a) (repealed Nov. 10, 1988).

During 1988, that section recited:

(1) **In general.**—If any part of any underpayment ... is due to negligence (or disregard of rules or regulations), there shall be added to the tax an amount equal to 5 percent of the underpayment. 26 U.S.C. § 6653(a) (eff. Nov. 10, 1988; repealed Dec. 19, 1989).