**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0558n.06

No. 18-1524

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| JOY FORD, | ) | |
| | ) | |
| **Petitioner-Appellant,** | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES TAX |
| | ) | COURT |
| COMMISSIONER OF INTERNAL | ) | |
| REVENUE, | ) | |
| | ) | **OPINION** |
| **Respondent-Appellee.** | ) | |
| | ) | |

**FILED**
Nov 05, 2018
DEBORAH S. HUNT, Clerk

Before: MOORE, GIBBONS, and COOK, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** "Find a job doing something you love." Perhaps that is sound advice. But deducting business losses from your taxes when you are not trying to profit from the business you love is not a sound strategy. Here, the Tax Court found that the appellant did just that: ran a business doing something she loved, accumulated substantial losses, and deducted those losses from her income. Because the court below did not commit clear error in making this determination, we **AFFIRM.**

## I. BACKGROUND

Joy Ford is a former country-music artist who, together with her producer-and-record-label-owner husband, bought a music venue called Bell Cove in 1986. R. 17 (May 10 Trial Tr. at 58–60).[1] Together they operated Bell Cove until Ford's husband died in 1999. During that time,

---

[1] There are two Tax Court dockets relevant to this case (018605-16 and 008575-16), but they are identical for the purposes of appeal and so we do not distinguish between the two.

Bell Cove was small but mighty. Songwriters would practice their material there, and would sometimes make it big. *See, e.g.*, *id.* at 62. Ford re-opened Bell Cove in or around 2008, but was unable to turn the venue's reputation into profits. *See Ford v. Comm'r*, 115 T.C.M. (CCH) 1027, at *4 n.4 (T.C. 2018) (noting Ford's losses between 2008 and 2014 totaled $420,253). She deducted the losses incurred by Bell Cove on her tax returns and continued to run the business. This was likely to her benefit, as she received significant amounts of income from trusts set up by her late husband. *Id.* at *3–4.

In 2016, the Commissioner of Internal Revenue issued to Ford notices of deficiency for the years 2012–14. The Commissioner had determined that Ford could not deduct Bell Cove's losses because she was not operating with the primary intent of profiting. Ford challenged the determinations and ended up in Tax Court. R. 1 (Petition).

Ford appeared in Tax Court in May 2017, accompanied by her tax preparer but without counsel. She spoke to the court twice on May 8, 2017, R. 12, but did not settle her case. The court scheduled trial for May 10 and told her to find counsel if she could. R. 19 (May 8 Recall Tr. at 3–4). She returned on May 10, again with her tax preparer but without counsel. Both testified about their experiences with Bell Cove and its profitability. *See* R. 17 (May 10 Trial Tr.).

Bell Cove, under Ford's management, was primarily a music venue that operated regularly on weekends. *Id.* at 36–37. She brought in singers, songwriters, and bands (whom she paid to perform) and charged $5 cover. *Id.* at 68. She sold snacks and non-alcoholic beverages, but she did not use Bell Cove's full kitchen or bar to sell food or alcohol. *Id.* at 87. She also hosted special

2

events, such as weddings or parties, for which she charged rent (between $500 and $1500 for a wedding) and sometimes provided pre-prepared snacks and finger foods. *Id.* at 86.

Ford had to deal with natural disasters that damaged Bell Cove. Flooding in 2010 and storms thereafter were setbacks. *Id.* at 33. Nevertheless she had great hopes. Specifically, she was in talks with television and movie producers about either a special show recorded at Bell Cove or a show about its storied history. *See, e.g.*, *id.* at 90–91.

After the trial and post-trial briefing (for which Ford obtained counsel), the Tax Court decided in favor of the Commissioner. It found that Ford was not operating Bell Cove with the primary intent to profit and therefore she could not deduct its losses. This appeal followed.

## II. ANALYSIS

This appeal raises two issues. First, Ford argues that the Tax Court erred when it failed to act sua sponte and grant her a continuance at the May 8, 2017 calendar call. Second, Ford argues that the determination that she was not operating Bell Cove for profit was incorrect.

### A. The Tax Court's Decision Not to Grant a Continuance Sua Sponte

We review for abuse of discretion a lower court's decision not to grant a continuance. *See Landrum v. Mitchell*, 625 F.3d 905, 927 (6th Cir. 2010). Because Ford did not request a continuance, there is no reasoning or argument for us to review. Instead we look at the record to determine whether the circumstances would warrant the extraordinary conclusion that the court abused its discretion by failing to act sua sponte. But far from justifying such a conclusion, the record below reveals that the Tax Court acted in a reasonable and responsible matter. Ford makes

two arguments as to why that is not so—arguments she presents without a single case citation. But those arguments lack merit entirely.

First, this argument suffers from a fundamental flaw: Ford failed to raise it in post-trial briefing to the Tax Court, for which she had counsel. For this reason alone Ford is precluded from making this argument on appeal. *See Richardson v. Comm'r*, 509 F.3d 736, 743 (6th Cir. 2007); *Estate of Quirk v. Comm'r*, 928 F.2d 751, 757–58 (6th Cir. 1991) ("It is well-settled that, absent exceptional circumstances, a court of appeals will not consider an argument by an appellant that was not presented to or considered by the trial court."). Ford argues that exceptional circumstances excuse her failure to raise this below. Even if we were to agree, however, this argument fails on its merits.

Ford argues that the Tax Court abused its discretion for two reasons. First, she says that the Tax Court erred because it "treat[ed] [Billy King, Ford's tax preparer] as Ms. Ford's counsel" and "presum[ed] that Ms. Ford was represented and that she was prepared to proceed in this litigation with adequate knowledge of the procedural requirements and with representation." Reply Br. at 3–4. This is plainly false. Although the Tax Court repeatedly referred to King as a CPA (Certified Public Accountant) when King is in fact neither a CPA nor enrolled to practice before the Tax Court, R. 19 (May 8 Calendar Call Tr. at 2, 7, 9–10), this does not mean that the Tax Court was laboring under the misapprehension that King was Ford's counsel or that Ford was represented at all. The record reveals that the Tax Court knew that Ford was unrepresented. During the first calendar call, King told the Tax Court he could not practice and would be a witness only. *Id.* at 11. The court then said that it "anticipate[d] that [King will] be working with Ms.

4

Ford so that she has a better understanding of what the rules are," but also suggested that King and Ford meet with a Legal Aid attorney to "get a better assessment of the strength of [Ford's] case." *Id.* at 11–12. An hour and a half later, the court saw Ford and King again, learned Ford talked to the Legal Aid attorney (although she did not qualify for representation), and—most damning to Ford's argument—recommended that Ford obtain counsel. R. 20 (May 8 Recall Tr. at 2–4) ("Ms. Ford, I always think that if parties can get counsel, it's best to have counsel on a tax matter. . . . [I]t helps to have counsel but it's very late in the game now."). The Tax Court clearly knew that Ford did not have counsel.

Ford's second argument for why the Tax Court was required, sua sponte, to give her a continuance is that she "plainly exhibited a misunderstanding of the appeal process and her rights," based at least in part on her illnesses leading up to the trial. Appellant Br. at 16–17. Although Ford may have been confused, it is patently untrue that she was "not afforded a fair opportunity to develop the record in this case." *Id.* at 17. She received notices of deficiency in January and May 2016; she filed petitions contesting the deficiencies in April and August 2016; she was given notice in December 2016 and again in March 2017 of the trial date. *Ford*, 115 T.C.M. (CCH) 1027, at *4; R. 4 (Notice of Trial); R. 6 (Reminder Notice of Trial). She had ample time to engage counsel if she was so inclined, even accounting for her illness and the storm that hit Bell Cove.[2] R. 19 (May 8 Calendar Call at 7).

---

[2]Appellant asserts in her brief that "Ms. Ford . . . attempted to obtain assistance of counsel, but she was unable to identify an attorney that would take her case prior to the scheduled trial date." Appellant Br. at 7. This is untrue. Ms. Ford said that she was sick for some period prior to May 2017, but nowhere says she attempted to or was unable to obtain assistance of counsel. We note this contention seems implausible, given Ford's resources and her ability to obtain counsel for post-trial briefing with a day's notice.

In sum, there is absolutely no basis for the argument that the Tax Court abused its discretion by failing to grant a continuance sua sponte.

**B. The Tax Court's Determination That Bell Cove Was Not Operated For Profit**

Ford argues also that the Tax Court's determination that she was not operating Bell Cove for profit was incorrect. This was a factual determination, and the Tax Court's findings "are entitled to deference by the appellate court. However, an appellate court may reverse a lower forum's factual finding for clear error when, even though the record contains some evidence in support of the finding, consideration of the overall evidence leaves the reviewing court 'with the definite and firm conviction that a mistake has been committed.'" *Holmes v. Comm'r*, 184 F.3d 536, 543 (6th Cir. 1999) (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 622 (1993)).

Section 183 of the Internal Revenue Code governs this case. It provides that "[i]n the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed." 26 U.S.C. § 183(a). The Treasury Regulations promulgated under § 183 give nine factors to consider when determining whether a taxpayer's activity was engaged in "for profit." They are: (1) the "[m]anner in which the taxpayer carries on the activity"; (2) "[t]he expertise of the taxpayer or his advisors"; (3) "[t]he time and effort expended by the taxpayer in carrying on the activity"; (4) the "[e]xpectation that assets used in activity may appreciate in value"; (5) "[t]he success of the taxpayer in carrying on other similar or dissimilar activities"; (6) "[t]he taxpayer's history of income or losses with respect to the activity"; (7) "[t]he amount of occasional profits, if any, which are earned"; (8) "[t]he

financial status of the taxpayer"; and (9) "[e]lements of personal pleasure or recreation." Treas. Reg. § 1.183-2(b) (1972). These factors are guides only. "[N]o one factor is determinative . . . . [and] it is not intended that only the factors described . . . are to be taken into account." *Id.*

The Tax Court considered these factors and determined that Ford "did not have the requisite intent to make a profit." *Ford*, 115 T.C.M. (CCH) 1027, at *5. It said that Ford "had no expertise in club ownership, maintained inadequate records, disregarded expert business advice, nonchalantly accepted Bell Cove's perpetual losses, and made no attempt to reduce expenses, increase revenue, or improve Bell Cove's overall performance." *Id.* It noted also that the amount of Bell Cove's accumulated losses exceeded the appreciation in property value. *Id.* at *5 n.7.

Ford argues that the Tax Court erred, and she focuses especially on the natural disasters that struck Bell Cove. But a review of the record does not leave us with the "definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prods. of Cal.*, 508 U.S. at 622. Rather, a review of the record in light of the factors and circumstances as a whole show that Ford was not operating Bell Cove with the intent to profit.

We take the § 183 factors one at a time:

**1. The Manner in Which the Taxpayer Carries on the Activity**

The first factor asks whether the taxpayer "carries on the activity in a businesslike manner and maintains complete and accurate books and records." Treas. Reg. § 1.183-2(b)(1). Doing so may indicate the intent to profit. So too may "carr[ying] on [the activity] in a manner substantially similar to other activities of the same nature which are profitable[,] . . . . [a] change of operating methods, adoption of new techniques[,] or abandonment of unprofitable methods." *Id.*

The Tax Court found that Ford maintained inadequate records, and we agree. The record shows that Ford kept her receipts and bills and tracked her income, but she admitted that she did not have any sort of "recordkeeping system[]" designed to help her improve her operations. Appellant Br. at 25. But the extent to which this factor cuts against Ford goes beyond her informal recordkeeping system.

First, we agree with the Tax Court that Ford "made no attempt to reduce expenses." *Ford*, 115 T.C.M. (CCH) 1027, at *5. Her utilities alone cost nearly as much as she made in a year—in part because she kept the stage lights on during the week when Bell Cove was closed and kept power running to the unused refrigerators in her commercial kitchen. R. 17 (May 10 Trial Tr. at 37–38, 84–85). She did not consider raising the regular cover charge to more than $5 a head. *Id.* at 90 (The Court: "In 2012 when you got your tax return back and it shows a loss . . . . [w]hat did you do going forward to try to correct that? . . . [Did you] increase the cover charge or charge more for a party? What type of steps did you take to make sure you covered at least your cost? Ford: "Well, I'm really not sure what you're saying."). She would not do anything that would "tak[e] away from [her] songwriters." *Id.* at 96.

Her activities to try to make the business profitable were minimal. She advertised the business, but through limited channels. *Id.* at 95 ("The Court: And how do you advertise? Ms. Ford: I advertise [Bell Cove] in this little paper that we've got[.] It's called the Standard, and I advertise in the Star News, which is now brought [sic] out by Tennessean. . . . And I go to wherever I can go to get people to come to the Bell Cove."). She hosted events such as weddings and charged $500 to $1500 to rent out the facility, but appears not to have considered proposals to put a wedding

chapel in the venue. *Id.* at 82, 86. Ford says in her briefing that she declined to sell alcohol because she did not want to take the "risks associated with serving alcohol." Appellant Br. at 26. That seems prudent, potentially, until you realize that Ford allowed patrons to bring in their own alcohol and coolers of beer.[3] R. 17 (May 10 Trial Tr. at 10–11). The record paints a picture of a business operated without regard to cost or profit. There is nothing indicating Ford operated in a "businesslike manner."

### 2. The Expertise of the Taxpayer or Her Advisors

This factor represents our sole point of disagreement with the Tax Court, although as explained below it does not affect the outcome. The Tax Court says that Ford "had no expertise in club ownership," but that is not entirely accurate. *Ford*, 115 T.C.M. (CCH) 1027, at *5. Ford and her husband ran Bell Cove successfully for years prior to his death. *See* R. 17 (May 10 Trial Tr. at 59–61). It is unclear from the record what Ford's role was in the original iteration of Bell Cove, and so we are unable to say she was inexpert at running this business.

The expertise of advisors, however, is a different story. Regulation § 1.183-2(b)(2) says that "[w]here a taxpayer . . . procures such expert advice, but does not carry on the activity in accordance with such practices, a lack of intent to derive profit may be indicated." That is exactly what happened here. Ford consulted with business experts about ways to make Bell Cove profitable, and they had suggestions for her, such as using Bell Cove as a restaurant. R. 17 (May

---

[3]Ford's opening brief says that "she has plans to begin using the kitchen more extensively in the future" and cites pages 88–90 of the trial transcript for support. Appellant Br. at 5. But nowhere in those pages does Ford say that she plans to use the kitchen—she merely says that the purpose of the kitchen is so that "I can have a restaurant, full-blown restaurant, if I want." R. 17 (May 10 Trial Tr. at 89).

10 Trial Tr. at 95–96). But she refused. Instead, she continued charging only $5 per ticket and paying the band performers $500, because that was what was best for the songwriters. *Id.* at 68. But in a more general sense, Ford's refusal to change her practice sets her apart from those who operate a business for profit and therefore "implement[] practices to correct the causes of their failures." *Holmes*, 184 F.3d at 544.

Ford's refusal to follow expert advice in the face of her ongoing inability to turn a profit means that this factor also cuts against her case.

### 3. The Time and Effort Expended by the Taxpayer in Carrying on the Activity

It is undisputed that Ford spent much time and effort running Bell Cove—it seems that she poured her heart and soul into it. But Regulation § 1.183-2(b)(3) says that this factor indicates intent to profit "particularly if the activity does not have substantial personal or recreational aspects" or where the taxpayer withdraws from another occupation. Treas. Reg. § 1.183-2(b)(3). Ford clearly loves country music, and running Bell Cove provided her with substantial personal fulfillment. Therefore this factor neither aids nor injures Ford.

### 4. The Expectation that Assets Used in the Activity May Appreciate in Value

"The term profit encompasses appreciation in the value of assets, such as land, used in the activity. Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation." Treas. Reg. § 1.183-2(b)(4).

Ford argues that this factor favors her because Bell Cove has nearly doubled in value. But, as the Tax Court correctly pointed out, Ford's accumulated losses exceeded the amount of appreciation. *Ford*, 115 T.C.M. (CCH) 1027, at *5. Therefore, Ford does not have a strong argument that she intended to make an overall profit by combining appreciation in land value with the income from Bell Cove. In addition, it is unclear whether Ford can show intent to profit using this method. "The IRS allows taxpayers to aggregate deductions and income from separate activities only if they show that the undertakings are sufficiently interconnected. For example, '[w]here land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value.'" *Losantiville Country Club v. Comm'r*, --- F.3d ---, No. 17-2394, 2018 WL 4959673, at *5 (6th Cir. October 15, 2018) (internal citations omitted) (quoting Treas Reg. § 1.183-1(d)). But "[t]axpayers cannot 'avoid section 183 and deduct large losses simply by conducting an unprofitable activity on a piece of land that is appreciating independently of or in spite of the activity.'" *Id.* (quoting *LaMusga v. Comm'r*, 45 T.C.M. (CCH) 422 (1982)). It is unclear whether Bell Cove can benefit from this factor then, although given the large amount of accumulated losses it is unnecessary to decide this question.

### 5. The Success of the Taxpayer in Carrying On Other Similar or Dissimilar Activities

As discussed *infra*, Ford and her husband ran Bell Cove successfully before his death. Although Ford's role in the prior operation is not fleshed out, this factor does favor her, as it "may

indicate that [she] is engaged in the present activity for profit, even though the activity is presently unprofitable." Treas. Reg. § 1.183-2(b)(5).

### 6. The Taxpayer's History of Income or Losses With Respect to the Activity

If Ford is hanging her hat on any one factor, it would be this one. This factor says:

A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. *If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market conditions, such losses would not be an indication that the activity is not engaged in for profit*. A series of years in which net income was realized would of course be strong evidence that the activity is engaged in for profit.

Treas. Reg. § 1-183.2(b)(6) (emphasis added). Bell Cove was hit by a flood in 2010 and more storms in the time following. They obviously cost Ford money, and we imagine also suppressed her ability to profit somewhat, although she did not mention that she had to close the club for any significant period of time for repairs. Certainly in some circumstances bad luck and bad weather can justify a for-profit venture's failure to profit. *See Holmes*, 536 F.3d at 544 ("Although a confluence of inexperience and an inordinate stroke of meteorological adversities plagued the taxpayers' various ventures during the five tax years at issue, the record nonetheless mirrored their dedication to the development of their farm's pecuniary potential."). But that is not the case here.

The Regulation says that "[i]f losses are sustained *because of* unforeseen or fortuitous circumstances . . . such losses would not be an indication that the activity is not engaged in for profit." The problem for Ford is that her losses are were not attributable to the floods and storms.

Rather, as discussed above, her expenses far outstripped her earnings. Of the years at issue, her income was the highest in 2012, at around $17,000; that year also saw her expenses at their least, around $56,000. We know her utilities alone exceeded $10,000 and she paid a band leader $46,000 a year in at least 2014. R. 17 (May 10 Trial Tr. at 40–41). We know she paid the performers $500 a night. *Id.* at 97. We know that Ford charged a $5 cover charge with no stated intentions of raising the price. *Id.* at 68. It is hard to see how Ford would have been able to cover her regular operating expenses, which were many times as much as her income. It cannot be said that her losses were *because of* the disasters that hit Bell Cove, nor are they attributable to start-up costs. This factor cuts against Ford.

### 7. The Amount of Occasional Profits, If Any, Which Are Earned

This factor says:

> The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent. An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. However, substantial profit, though only occasional, would generally be indicative that an activity is engaged in for profit, where the investment or losses are comparatively small. Moreover, an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated.

Treas. Reg. § 1-183.2(b)(7). This factor addresses what seems to have been Ford's actual plan to profit off Bell Cove: make a TV show or movie set at or based on Bell Cove. This factor could *perhaps* cut in Ford's favor, then, if we were willing to accept that running a music venue is a "highly speculative venture." But Ford's larger problem is that she has not demonstrated an actual

13

"opportunity to earn a substantial ultimate profit." She told the Tax Court at trial that she was about to make a deal for a show about Bell Cove, but she did not know how much she would earn from that contract. R. 17 (May 10 Trial Tr. at 90–92). There is absolutely nothing in the record to show that the money she would make from a media deal would come close to justifying her losses. The record *does* show mounting large losses and no profits whatsoever. In the end this factor is of no help to Ford.

### 8. The Financial Status of the Taxpayer

It is undisputed that Ford has substantial income from trusts and her personal brokerage account. She received over $180,000 in distributions from the trusts during each year at issue. *Ford*, 115 T.C.M. (CCH) 1027, at *3–4. "Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved." Treas. Reg. § 1.183-2(b)(8). This factor cuts against Ford.

### 9. Elements of Personal Pleasure or Recreation

Ford did "not deny that she gains pleasure from the operation of the Bell Cove," and the record makes obvious to any reader the fact that Ford has a great passion for country music. R. 23 (Pet'r Simultaneous Opening Br. at 5). This factor cuts against Ford also.

In the end, this case is not difficult. Ford was driven by a love of country music, a love for the songwriters, and a love of Bell Cove. When asked whether she ever considered closing Bell Cove, she said "[n]o." Not because she believed that it would one day be profitable, but because "it's known all over the world already." R. 17 (May 10 Trial Tr. at 100). The Tax Court did not

14

commit clear error when it found that Ford was not operating Bell Cove for profit and therefore could not deduct its losses.

### III. CONCLUSION

For the reasons stated above, we **affirm** the judgment of the Tax Court.