**Benny and J. Ruth MULLINS,**
**Plaintiffs,**

v.

**UNITED STATES of America,**
**Defendant.**

**No. 3:01–CV–171.**

United States District Court,
E.D. Tennessee,
at Knoxville.

July 14, 2004.

trial briefs [Docs. 98 and 99]. The following constitute the Court's findings of fact and conclusions of law filed pursuant to Fed.R.Civ.P. 52(a).

### Findings of Fact[1]

Benny Mullins was raised on a small farm in Clintwood, Virginia. As a child, he worked on the farm and dreamed of owning his own farm to raise cattle one day. Mr. Mullins went to school through the eighth grade. He married J. Ruth Mullins fifty years ago, and the couple has four grown children—two sons and two daughters.

After serving an apprenticeship in toolmaking and working as a toolmaker in Detroit, Mr. Mullins settled in Clinton, Tennessee, and purchased a toolmaking business with a partner in 1963. The business is known as Oak Ridge Tool Engineering ("ORTE") and makes parts as an aerospace and defense contractor for clients such as the Department of Energy, the Department of Defense, NASA, Boeing Aircraft, and Lockheed Martin. Since Mr. Mullins took over ORTE, the business has been very successful and has experienced a profit for twenty-five consecutive years.

Mr. Mullins has earned a substantial income from ORTE since the early 1970s [*see* Govt. Exs. 8–31; Doc. 88, ¶ 6–8]. At the time of trial, Mr. Mullins was sixty-nine years old and was retired from ORTE since 1999. However, he still serves as president and chairman of the board of ORTE and continues to work an average of ten hours per week at the company, as he did during 1995, 1996, and 1997 ("the years at issue"). Terry and Steve Mullins, his two sons, now operate ORTE as the vice presidents. They continue to pay their father income from ORTE as a bonus ered accordingly.

Bradley H. Hodge, Mack A. Gentry, Gentry, Tipton, Kizer & McLemore, PC, Knoxville, TN, for Plaintiffs.

Jennifer L. Best, Beatriz T. Saiz, U.S. Department of Justice Tax Division, Washington, DC, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

VARLAN, District Judge.

### Introduction

Plaintiffs, Benny and J. Ruth Mullins, filed this refund action against the defendant, United States of America ("U.S."), in order to challenge the assessment of income tax deficiencies relating to their farming activities during tax years 1995, 1996, and 1997. Plaintiffs specifically seek to recover income taxes in the amount of $93,050.45, which were paid as a prerequisite to filing a refund claim and to stop the accrual of interest. More specifically, plaintiffs made payments for income tax deficiencies in the amount of $18,987.28 for 1995, $22,447.00 for 1996, and $33,122.36 for 1997. Plaintiffs also paid interest in the amount of $18,493.81, and they seek to recover this interest pursuant to 26 U.S.C. § 6611. Finally, plaintiffs seek attorney fees and litigation expenses pursuant to 26 U.S.C. § 7430. This action was tried without a jury from September 30 through October 2, 2003. The parties have filed proposed findings of fact and conclusions of law [Docs. 74 and 97] as well as post-

1. Some of the facts and exhibits have been stipulated by the parties and will be consid-

for his pivotal work for the company in the past and for his continued work in maintaining and dealing with customers. Mrs. Mullins raised their four children and has been employed at ORTE to clean the company offices for a number of years. At the time of trial, she was sixty-six years old.

After establishing ORTE as a solid business, Mr. Mullins decided to raise cattle on a farm. Before doing so, he consulted with several individuals, including a cattle rancher from Montana, a veterinarian who owned a nearby farm, and other neighbors who owned cattle. In 1973, Mr. Mullins purchased 110 acres of land known as the Frost Bottom Farm in Anderson County, Tennessee. The purchase price for this land was approximately $40,000 to $42,000. Mr. Mullins testified that his intention in purchasing the Frost Bottom Farm was to raise beef cattle and make a profit.

The land at Frost Bottom Farm was neglected and had no livable house located on it. In order to prepare the land for a herd of cattle, Mr. Mullins immediately began to clear, fertilize, and lime the land and to build fences, corrals, and water holes. Mr. Mullins, with some help from his family, performed most of the work necessary to prepare the land for a cattle farm. Approximately six to eight months after the Frost Bottom Farm was purchased, Mr. Mullins placed twenty-three cows and one bull on the land.

In 1975, Mr. Mullins bought 100 additional acres of land to expand the Frost Bottom Farm. This land was also neglected, and again Mr. Mullins did most of the work necessary to prepare the land for raising cattle. Also in 1975, Mr. Mullins purchased 160 acres of land known as the Andersonville Farm located in Anderson County, paying $125,000. The land on the Andersonville Farm was also neglected, and once again Mr. Mullins did most of the work necessary to prepare the land for a cattle farm. Just as with the two pur-

chases of land comprising the Frost Bottom Farm, Mr. Mullins testified that his intention in purchasing the Andersonville Farm was to raise beef cattle and make a profit.

Mr. Mullins purchased a small farm known as the Granite Road Farm for $22,482 in 1976. He also placed cattle on the Granite Road Farm. In the early 1980s, Mr. Mullins purchased 291 acres of land known as the Bush Farm for $292,000. As with the prior purchases of land, Mr. Mullins did most of the work in order to prepare the Bush Farm for raising cattle. By this time period, the size of his cattle herd was approximately seventy to one hundred head of cattle. Additionally, Mr. Mullins sold timber from the Andersonville Farm for $53,000 in the early 1980s.

In 1982, Mr. Mullins and his two sons purchased an interest in a livestock auction business located in Anderson County. He made this purchase in order to provide a "better way" to sell his cattle and to purchase replacement cattle. He would then fatten the new cattle on his farm in order to resell them at the auction. Around the end of the 1980s or the beginning of the 1990s, Mr. Mullins discontinued the livestock auction business because it was too labor intensive and was not helping his farm operation.

Plaintiffs moved into a small tenant house located on the Bush Farm in 1984. Prior to this time, they had never lived on any of the farm land used for raising cattle. The house had one bathroom, no central air conditioning, and a wood stove for heat. The fair market value of the house was $20,000. Before moving to this house, plaintiffs lived in an attractive house in a subdivision. Mrs. Mullins testified that she was willing to move to the house on the Bush Farm because she knew her husband wanted to concentrate on his cat-

tle farm there. Plaintiffs lived in the house on Bush Farm for approximately two years before they bought a house on some adjoining property. Near the end of the 1980s, Mr. Mullins bought an additional 160 acres of land that adjoined the Bush Farm, bringing the total acreage of the Bush Farm to 451 acres.

During the early days of his cattle farming, Mr. Mullins worked on the farm whenever he was not working at ORTE, mostly during the evenings after work and on weekends and holidays. He would occasionally hire day laborers to help with certain tasks on the farm. Around 1978, Mr. Mullins reorganized ORTE to give his sons more responsibility and control, allowing him more time to raise cattle on his farm. By the early to mid 1990s, including the years at issue, Mr. Mullins worked an average of fifty hours per week on the farm doing a variety of tasks, including caring for and doctoring the cattle, building fences, repairing corrals, and digging water holes. He maintained approximately seventy head of cattle during the years at issue. Mr. Mullins did not track the number and type of cattle in his herd because he traded them so frequently. Neither did Mr. Mullins devise a written farm plan or develop a budget for his cattle farm. Mr. Mullins testified that the market conditions for selling beef cattle were declining during the years at issue.

In their testimony, Mrs. Mullins and Terry Mullins verified the amount of time and degree of effort that Mr. Mullins spent working on the cattle farm. Mrs. Mullins testified that her husband would leave early in the morning, anywhere from 4:00 a.m. to 6:00 a.m., and then return home late at night. She also explained that there were times when he would get up in the middle of the night to tend to ailing cattle. Terry Mullins stated that he observed his father work on the cattle farm many times, including weekends and holidays, and he would occasionally help his father on the farm. According to Terry Mullins, his father bought the farm properties in order operate a cattle farm business.

In the 1970s, Mr. Mullins employed a cow-calf operation to raise cattle. This method means that cows were bred to produce calves which would then be marketed after they were weaned. With this operation, he did not use a controlled breeding season where the bull is left with the cattle herd for a certain length of time and then removed. Instead, he allowed the bull to be with the cattle herd year round, which resulted in calving seasons during the spring and fall. Mr. Mullins used this operation because the controlled breeding season method was too difficult, both because the bull was difficult to control and because it would take years to utilize that method effectively. In fact, Mr. Mullins does not know of any other cattle farmers in the eastern Tennessee area who used a controlled breeding season. For several years during and after the operation of the livestock auction business, Mr. Mullins also tried a method called backgrounding, which involves fattening a weaned calf and selling it to a feed lot, which then doubles the calf's weight before selling it to a kill lot. When this method did not help his cattle farm operation, Mr. Mullins reinstituted the cow-calf operation.

Throughout the years of his cattle farm operation, Mr. Mullins consulted with a number of individuals who have experience with raising cattle in order to keep abreast of proper industry practices. Mr. Mullins communicated on a regular basis with Ned Welburn, a cattle rancher in Montana; his neighbor, a veterinarian who owned a cattle farm; Joseph Hall, an agricultural extension agent in Anderson County; and Anthony Jenkins, a veterinarian who treated his cattle herd. At times, Mr. Mullins

consulted with the University of Tennessee to determine whether he was operating his cattle farm properly, and he also consulted with farmers from Knox County. In addition, Mr. Mullins regularly subscribed to and read weekly and monthly publications relating to cattle farming. Also, he was a member of the Tennessee Cattlemen's Association and attended various meetings and seminars on raising cattle. Terry Mullins confirmed that his father consulted a variety of people and several written resources about the cattle raising business.

Joseph Hall has been the agricultural extension agent in Anderson County for the past thirty years, and his duties include assisting farmers with any farm management problems and making recommendations to increase their farm profit. He also provides advice to farmers regarding pasture management, fertility, weed control, health management, parasite control, vaccinations, and soil and water quality. Mr. Hall has been providing assistance to Mr. Mullins with respect to his cattle farm since 1978.

Over the years, Mr. Hall has visited Mr. Mullins' cattle farm periodically and he has talked to Mr. Mullins frequently over the phone. Also, he would see Mr. Mullins almost every week during the years that the livestock auction business was operational. During the years at issue, he discussed marketing conditions with Mr. Mullins, including what types of bulls and cows were bringing the highest price at sales. Mr. Hall testified that he was familiar with the marketing conditions for beef cattle during the years at issue, and that beef prices were low in 1994 and 1995.

Mr. Hall has also provided assistance to other farmers, approximately thirty to fifty on average, in Anderson County for many years. Based upon his observations, only twenty percent of farmers in the area use a controlled breeding season. In addition, Mr. Hall only knows of one or two farmers in the area who maintain a written farm plan. He explained that farmers simply keep plans in their heads. Based upon his regular observations of the work performed on the Mullins cattle farm, including the years at issue, Mr. Hall stated that Mr. Mullins was a very hard worker who took good care of his cattle and who acted upon his recommendations to improve profitability.[2]

Anthony Jenkins has been a veterinarian for thirty-six years, and he has a large animal practice. Dr. Jenkins first became acquainted with Mr. Mullins when he purchased the livestock auction business in the early 1980s. Dr. Jenkins was already providing veterinary services to the business and continued doing so after Mr. Mullins came on board. Shortly thereafter, Dr. Jenkins began treating Mr. Mullins' cattle herd eight to ten times per year, including the years at issue.

Dr. Jenkins also provided veterinary services for twenty-five to thirty other farmers in the area. Based upon his experience, he testified that he has never had a client who used a controlled breeding season or had a written farm plan or budget; thus, Mr. Mullins was keeping records in a manner consistent with other farmers in the area. With regard to his familiarity with market conditions for beef cattle, Dr. Jenkins stated that beef prices were depressed during 1995 and 1996 and increased thereafter. During his visits to the Mullins cattle farm over the years, Dr.

---

**2.** Based upon his experience and interaction with Mr. Mullins, Mr. Hall also testified that he believed Mr. Mullins' hard work on his cattle farm indicated an intent to make a profit. The U.S. objected to this testimony and the Court took the matter under advisement. The Court now sustains the objection to the extent that the evidence will not be considered because it goes to the ultimate issue in the case.

Jenkins observed Mr. Mullins working very hard on his cattle farm.[3]

Mr. Mullins maintained one checking account for both personal expenses and farming expenses. Over the years, he has employed several different certified public accountants to prepare his tax returns with respect to personal matters and the cattle farm operation. The accountants would keep his personal funds separate from his farming funds even though one checking account was used. Mr. Mullins recalled making a profit from cattle sales during some of the years of his cattle farm operation. During the years at issue, Mr. Mullins did not make a profit from selling cattle. According to the records submitted by the U.S., in the twenty-four years he raised cattle, Mr. Mullins only earned a small net profit one year; in the remaining years, he incurred substantial operating losses.

Mr. Mullins testified that he earned substantial profits from selling his farm land over the years. In 1990, Mr. Mullins sold the Frost Bottom Farm for $214,000, and he received approximately $100,000 of interest income from the sale. The land on which the livestock auction was located sold for a profit in 1999. That same year, he sold his cattle herd for approximately $63,000. In 2001, the Andersonville Farm was sold for almost $600,000 along with interest income. Mr. Mullins sold the Granite Road Farm for $50,000 in 1995. These sales left Mr. Mullins with the Bush Farm, which is comprised of 451 acres.

Based upon comparable sales data, the fair market value of the Bush Farm has been appraised at $1,690,000 by Robert Fletcher, the real estate expert presented by plaintiffs. Mr. Fletcher considered the highest and best use of the Bush Farm to be for small residential development. According to Mr. Fletcher, Mr. Mullins had many ideas for the development of his property, including use as a resort and golf course. The U.S. offered the expert testimony of Randall Button that the Bush Farm is worth $540,000, a figure of appreciation significantly less in percentage terms than the appreciation on Mr. Mullins' other properties as indicated by the sales prices for those properties. Mr. Button considered the highest and best use of the Bush Farm to be vacant or improved agricultural use. The Court finds Mr. Fletcher to be a more credible witness than Mr. Button. In the opinion of the Court, Mr. Button did not use the most comparable properties available, and his slight valuation is inconsistent with the recent sales of Mr. Mullins' other farm land for substantial profits.

Around the age of sixty, Mr. Mullins began to experience some health problems. In particular, he began to experience arthritis in his legs, arms, and neck, and he developed diabetes. As a result of these problems, he had difficulty performing some of the physical labor on the farm, including hooking up implements, so he purchased some farm equipment to reduce his physical labor. During the years at issue, he bought three tractors, two loaders, two balers, a rake, a tedder, a mojo disk, a bulldozer, and a truck. This farm equipment has a fair market value of approximately $180,000 to $200,000. Mr. Mullins explained that he did not hire day laborers to help him because it did not make sense to hire them to hook up the implements and to then stand idle for

---

3. Dr. Jenkins further testified that because Mr. Mullins was working so hard on the cattle farm, he did not believe he was doing it for fun; instead, he was doing it to make money. No objection was raised to this testimony; however, as with Mr. Hall's similar testimony, the Court will not consider such evidence because it goes to the ultimate issue in the case.

hours until he was ready to hook up another implement. Mr. Mullins suffered his first stroke in 2001, his second stroke in 2002, and several mini strokes in 2003.

Mr. Mullins stated that his motive in operating the cattle farm was to make a profit, including the years at issue. Mr. Mullins explained that all farm work is labor and that he did not enjoy the actual farm work, though he enjoyed seeing the fruits of his labor. Mr. Mullins testified that he does not have any hobbies and that his cattle raising was not a hobby; if anything, work is his hobby. Based upon how hard her husband has worked on the cattle farm over the years, Mrs. Mullins testified that there is no way that he was doing the farm work as a hobby or for recreation. Terry Mullins testified that his father did not have any hobbies and if anything work was his hobby.[4] Mr. Mullins, Mrs. Mullins, and Terry Mullins all testified that neither they nor anyone else used the farm properties for recreational purposes.

After hearing the testimony at trial, reviewing the exhibits introduced into evidence, and considering the parties' proposed findings and conclusions, the Court will set out its conclusions of law. In doing so, the Court specifically finds that Mr. Mullins, Mrs. Mullins, Terry Mullins, Joseph Hall, Anthony Jenkins, and Robert Fletcher were all credible witnesses and therefore attaches great weight to their testimony. In particular, the Court notes that Mr. Hall and Dr. Jenkins also provided objective testimony, having no interest in the outcome of this matter.

### Ruling on Expert

■ As a preliminary matter to setting out its conclusions of law, the Court needs to address plaintiffs' motion in limine [Doc. 42] with respect to Robert Blaylock, an expert offered by the U.S. on the subject of Mr. Mullins' profit motive. In their motion in limine, plaintiffs challenged Mr. Blaylock's testimony based upon the teachings of *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. They argued that Mr. Blaylock's testimony should be excluded because he employed unfounded assumptions to generate his opinion, used unreliable principles and methods to reach his opinion, and failed to apply the methods and principles reliably in this case.

In a memorandum opinion and order dated August 25, 2003, the Court ruled that it would take plaintiffs' objection to Mr. Blaylock under advisement pending the proffer of his testimony at trial [*see* Doc. 69]. At trial, the U.S. presented the testimony of Mr. Blaylock, who rendered the opinion that Mr. Mullins did not engage in cattle farming with the intent to make a profit. Plaintiffs reasserted their objection to Mr. Blaylock's testimony, and the Court allowed the parties to address their positions in post-trial briefs. Having carefully considered this matter based upon the record as a whole and based upon the parties' arguments at trial and their post-trial briefs, the Court concludes that the testimony of Robert Blaylock should be excluded, and therefore plaintiffs' motion in limine [Doc. 42] will be granted.

---

4. Mrs. Mullins and Terry Mullins both offered testimony that Mr. Mullins was engaged in the cattle farm operation with the absolute motive to make a profit. The U.S. did not register an objection to Mrs. Mullins' testimony on this point but did with respect to Terry Mullins' testimony. Having taken the issue under advisement, as with other witnesses, the Court will sustain the objection and will not consider the evidence by either Terry Mullins or Mrs. Mullins on the ultimate issue of whether Mr. Mullins intended to make a profit.

Mr. Blaylock is employed as an extension animal scientist with the Alabama Cooperative Extension and as an associate professor with the Auburn University Animal Science Department. As an extension animal scientist, he specializes in beef cattle. Mr. Blaylock advises farmers in the operation of their cattle farms to maximize their investments, trains county extension agents in the area of beef cattle production, publishes materials to aid farmers and county extension agents in the area of beef cattle production, and has won various awards for his work in the field of beef cattle. For this case, Mr. Blaylock reviewed records and information provided to him, including the deposition of Mr. Mullins, and he also visited Mr. Mullins' cattle farm one time.

The U.S. asked Mr. Blaylock to review the manner in which Mr. Mullins conducted his cattle farm operation and to render an opinion about whether the manner in which it was conducted evidenced a profit motive. As will be detailed in the conclusions of law below, the manner in which the taxpayer carried on the activity is one of nine factors set forth in Treasury Regulation section 1.183–2(b) to determine whether an activity is engaged in for profit. In reaching his opinion that Mr. Mullins did not engage in raising cattle for a profit, Mr. Blaylock considered all the facts and circumstances known to him about Mr. Mullins' cattle farm operation, including the size of the cattle herd, the calving season used, the lack of cattle production or cost records, the breeds of cattle used, the expenses and losses incurred, the acreage owned, and the farm equipment purchased.

As pointed out by counsel for plaintiffs, Mr. Blaylock has limited knowledge about and experience with the beef cattle industry in eastern Tennessee and particularly in Anderson County during the relevant time period. In addition, counsel pointed out several errors in Mr. Blaylock's expert report. Moreover, counsel demonstrated that the hypothetical of his model herd contained incorrect calculations that, once corrected, changed the production and profitability results of the model herd. Based upon this demonstration, Mr. Blaylock admitted that a hypothetical farmer who owned his model herd would have a loss in each of the years at issue in this case.

Fed.R.Evid. 702 indicates that expert testimony is useful only if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." In this case, Mr. Blaylock used faulty assumptions to arrive at erroneous conclusions, he visited Mr. Mullins' cattle farm one time in contrast to the extensive contact of Mr. Hall and Dr. Jenkins, and he reached his conclusion based on the single factor of the manner in which Mr. Mullins carried on the activity without addressing the remaining eight relevant factors set forth in Treasury Regulation section 1.183–2(b) to determine whether an activity is engaged in for profit. Accordingly, the Court concludes that Mr. Blaylock's testimony is of extremely limited value because he lacks the requisite degree of trustworthiness and reliability contemplated by the appropriate evidentiary standard. Even if the Court were to consider Mr. Blaylock's testimony, it would not alter the Court's ultimate determination that Mr. Mullins engaged in his cattle farm activities with the appropriate intent to profit, as will be demonstrated below.

### Conclusions of Law

■ The Court has subject matter jurisdiction over this tax refund action pursuant to 28 U.S.C. § 1346(a)(1). Venue is

proper before this Court under 28 U.S.C. § 1402(a)(1). As a general rule, the burden of proof is on the taxpayer in a tax refund action. *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933). In order to recover on their refund claim, plaintiffs must prove by a preponderance of the evidence each fact upon which they assert that the Commissioner's assessment was erroneous or otherwise incorrect. *See U.S. v. Janis,* 428 U.S. 433, 440, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976).[5]

The central issue for determination is whether Mr. Mullins' farming activities were "not engaged in for profit" within the meaning of 26 U.S.C. § 183.[6] Section 183(a) provides that, if an activity engaged in by an individual is not engaged in for profit, no deduction attributable to that activity shall be allowed except as provided in section 183(b). Under section 183(c), an activity not engaged in for profit is defined as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

Section 162 allows a deduction for all ordinary and necessary expenses paid or incurred in carrying on any trade or business. Section 212 allows a deduction for all ordinary and necessary expenses paid or incurred for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income. Whether deductions are allowable under section 162 or section 212 depends on whether the taxpayer engaged in the activity with the objective of making a profit.

The Treasury Regulations promulgated pursuant to section 183 establish an objective test for determining whether a taxpayer is engaging in an activity for profit:

> The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit. . . . In determining whether an activity is engaged in for profit, greater weight is given to objective facts rather than to the taxpayer's mere statement of his intent.

Treas. Reg. § 1.183–2(a). As this regulation was explained in *Campbell v. Commissioner,* 868 F.2d 833, 836 (6th Cir.1989), "[a]n activity is engaged in for profit if the taxpayer entertained an actual and honest, even though unreasonable or unrealistic, profit objective in engaging in the activity."

As directed by the Sixth Circuit in *Campbell,* "a court must consider the objective facts and must also look to the nine general factors set out in the Treasury Regulations" in order to determine wheth-

---

**5.** Plaintiffs contend that the burden of proof shifts to the government pursuant to 26 U.S.C. § 7491(a)(1) because they have introduced credible evidence with respect to the factual issues relevant to ascertaining the liability of the taxpayer. The U.S. argues that this statute does not apply to plaintiffs because they failed to demonstrate that the examination of their tax returns began after July 22, 1998, as required. This issue was argued at trial, and the Court took the matter under advisement. Having considered the issue, the Court finds that the applicability of 26 U.S.C. § 7491 is moot since plaintiffs have carried their burden of proof sufficient to prevail on their refund claim and the U.S. did not offer contradictory evidence sufficient to overcome a finding in favor of plaintiffs.

**6.** Unless otherwise stated, all section references are to Title 26 of the United States Code, which is the title dealing with the Internal Revenue Code.

er such a profit motive exists. *Id.* Regulation section 1.183–2(b)(1)–(9) lists the nine relevant factors as follows:

(1) the manner in which the taxpayer carried on the activity;

(2) the expertise of the taxpayer or his advisors;

(3) the time and effort expended by the taxpayer in carrying on the activity;

(4) the expectation that assets used in the activity may appreciate in value;

(5) the success of the taxpayer in carrying on similar or dissimilar activities;

(6) the taxpayer's history of income or loss with respect to the activity;

(7) the amount of occasional profit, if any, which is earned;

(8) the financial status of the taxpayer; and

(9) whether the elements of personal pleasure or recreation are involved.

As the Sixth Circuit in *Campbell* further observed, no single factor is controlling. *Id.* For ease of discussion, several factors can be grouped together for purposes of analyzing the facts and circumstances applicable to this case.

■ The first factor involving whether the taxpayer acted in a businesslike manner in connection with the undertaking is defined under Regulation section 1.183–2(b)(1) as follows:

The fact that the taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit. Similarly, where an activity is carried on in a manner substantially similar to other activities of the same nature which are profitable, a profit motive may be indicated. A change of operating methods, adoption of new techniques or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive.

Regulation section 1.183–2(b)(2) explains the second factor regarding the expertise of the taxpayer and his advisors in this way:

Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. Where a taxpayer has such preparation or procures such expert advice, but does not carry on the activity in accordance with such practices, a lack of intent to derive profit may be indicated unless it appears that the taxpayer is attempting to develop new or superior techniques which may result in profits from the activity.

The time and effort expended by the taxpayer in carrying on the activity, which is the third factor, is defined by Regulation section 1.183–2(b)(3) as follows:

The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit. A taxpayer's withdrawal from another occupation to devote most of his energies to the activity may also be evidence that the activity is engaged in for profit. The fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity.

With respect to the fifth factor dealing with the success of the taxpayer in carrying on other similar or dissimilar activities, Regulation section 1.183–2(b)(5) provides:

The fact that the taxpayer has engaged in similar activities in the past and con-

verted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable.

With respect to these factors, the evidence reveals that Mr. Mullins desired to have a cattle farm from an early age and that he established a cattle farm at his earliest opportunity. Before doing so, Mr. Mullins worked hard for many years to make ORTE a profitable business. Since purchasing the business in 1963, ORTE has experienced a profit for twenty-five consecutive years, which is a testament to the work ethic of Mr. Mullins. It is the same work ethic which he instilled in his sons who now operate the business with the same determination and resolve. Indeed, despite his declining health, Mr. Mullins still serves as president and chairman of the board of ORTE and continues to work an average of ten hours per week at the company.

The record reflects that Mr. Mullins pursued his cattle farm operation with much of the same dedication and devotion that he applied to making ORTE a success. Prior to starting his cattle farm, Mr. Mullins consulted with several individuals who had extensive experience with raising cattle. In other words, he did not enter the business blindly; rather, he conducted much research in advance. Over time, Mr. Mullins acquired significant acreage of farm land, and with each tract purchase he intended to raise beef cattle for a profit. It was primarily Mr. Mullins who did the extensive manual labor necessary to prepare and maintain the farm land for raising cattle.[7] During his years in the cattle business, Mr. Mullins maintained a herd of seventy to one hundred cattle, and the size of his herd was approximately seventy cattle during the years at issue.

When he began his cattle farming, Mr. Mullins worked on the farm whenever he was not working at ORTE. He spent virtually all of his free time during the evenings after work and on weekends and holidays raising cattle. The reorganization of ORTE in 1978 to give his sons more responsibility and control allowed Mr. Mullins more time to concentrate on his cattle farming. In 1984, Mr. and Mrs. Mullins moved from an attractive house in a subdivision to a small tenant house with one bathroom, no central air conditioning, and a wood stove for heat. They made this sacrifice for two years so that Mr. Mullins could concentrate on raising cattle. By the early to mid 1990s, including the years at issue, he worked an average of fifty hours per week on his cattle operation and he only slowed down when his health problems forced him to do so. Both Mrs. Mullins and Terry Mullins verified the significant amount of time and degree of effort that Mr. Mullins spent working on the cattle farm.

The evidence reveals that Mr. Mullins experimented with different farming methods in an effort to increase profitability. For the first several years, he employed a cow-calf operation. He next purchased the livestock auction business to provide a "better way" to sell his cattle and buy replacement cattle. Later he tried backgrounding cattle, and when the backgrounding method did not help his cattle farm, he reinstituted the cow-calf operation. Although Mr. Mullins maintained one checking account for both personal

---

7. Mr. Mullins would occasionally hire day laborers to help on the cattle farm. The U.S. emphasized the fact that Mr. Mullins did not withhold and pay employment taxes on wages paid to these laborers from 1995 through 1997. Mr. Mullins testified that he relied on his accountant to handle those matters. The Court attaches little relevance to these facts, finding they do not substantially affect Mr. Mullins' profit motive in this case.

expenses and farming expenses, he employed certified public accountants who were able to keep his personal funds separate from his farming funds.

Throughout the years of his cattle farm operation, Mr. Mullins consulted on a regular basis with a number of individuals who have experience with cattle raising. In order to keep abreast of proper industry practices, he also read weekly and monthly publications relating to cattle farming and he attended various meetings and seminars as a member of the Tennessee Cattlemen's Association. In addition, Mr. Mullins received regular assistance on his cattle farm from Joseph Hall, the agricultural extension agent in Anderson County, and Anthony Jenkins, a veterinarian. Mr. Hall and Dr. Jenkins provided both credible and objective testimony in this matter.

Mr. Hall has been observing Mr. Mullins' work on the cattle farm on a periodic basis since 1978. According to Mr. Hall, Mr. Mullins was a very hard worker who took good care of his cattle and who acted upon his recommendations to improve profitability. Based upon his experience with other farmers in the area, Mr. Hall indicated that Mr. Mullins operated his farm like the majority of those other farmers—he did not use a controlled breeding season and he did not maintain a written farm plan.

Dr. Jenkins has been visiting Mr. Mullins' cattle farm to provide veterinary services to the cattle herd eight to ten times a year since the early 1980s. During those visits, he noted that Mr. Mullins worked very hard on his cattle farm. Based upon his veterinary work for numerous other farmers in the area, Dr. Jenkins testified that he has never had a client who used a controlled breeding season or had devised a written farm plan or budget.

Given all of this evidence, from both credible and objective sources, the Court finds that the first, second, third, and fifth factors set forth in Regulation section 1.183–2(b) favor a finding that Mr. Mullins engaged in his cattle farming activities with an "actual and honest" expectation of profiting from the undertaking, regardless of whether the expectation was "unreasonable or unrealistic." *See Campbell*, supra. The Court is persuaded that Mr. Mullins conducted his cattle farm operation in a businesslike manner overall; that he acquired some expertise in cattle raising through self-education and that he relied upon the expertise of others through regular consultations; and that he expended substantial time and effort in raising cattle while continuing to maintain a profitable business in ORTE.

The fourth factor set out in Regulation section 1.183–2(b)(4) involves the expectation that assets used in the activity may appreciate in value and is defined as follows:

> The term profit encompasses appreciation in value of assets, such as land, used in the activity. Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation. See, however, paragraph (d) of § 1.183–1 for definition of an activity in this connection.

In *Holmes v. Commissioner*, 184 F.3d 536, 546 (6th Cir.1999), the Sixth Circuit explained how to properly apply Regulation section 1.183–2(b)(4), holding that the tax court below had facially misapplied it.

As a preliminary matter to addressing how to apply the fourth factor, it should be noted that the Sixth Circuit in *Holmes* does not discuss the interplay between

Regulation sections 1.183–2(b)(4) and 1.183–1(d). In fact, the Court has not been able to locate Sixth Circuit authority interpreting how 1.183–1(d) affects 1.183–2(b)(4). Based on the underlying tax court opinion of *Holmes v. C.I.R.*, T.C. Memo 1997–401, 1997 WL 561258 (1997), however, it appears that 1.183–1(d) guides whether several undertakings may be considered as one activity for purposes of applying the appreciation in value factor described in 1.183–2(b)(4). Various other opinions offer the same guidance. *See Estate of Power v. Commissioner*, 736 F.2d 826, 829 (1st Cir.1984); *Burrus v. Commissioner of Internal Revenue*, T.C. Memo 2003–285 (2003); *Sanders v. Commissioner*, T.C. Memo 1999–208 (1999); and *Hoyle v. Commissioner*, T.C. Memo 1994–592 (1994).

With these decisions in mind, Regulation section 1.183–1(d) provides as follows:

In order to determine whether, and to what extent, section 183 and the regulations thereunder apply, the activity or activities of the taxpayer must be ascertained. For instance, where the taxpayer is engaged in several undertakings, each of these may be a separate activity, or several undertakings may constitute one activity. In ascertaining the activity or activities of the taxpayer, all the facts and circumstances of the case must be taken into account. Generally, the most significant facts and circumstances in making this determination are the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings. Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities. The taxpayer's characterization will not be accepted, however, when it appears that his characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case. If the taxpayer engages in two or more separate activities, deductions and income from each separate activity are not aggregated either in determining whether a particular activity is engaged in for profit or in applying section 183. **Where land is purchased or held primarily with the intent to profit from increase in its value**, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value. Thus, the farming and holding of the land will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land (that is, deductions other than those directly attributable to the holding of the land such as interest on a mortgage secured by the land, annual property taxes attributable to the land and improvements, and depreciation of improvements to the land).

(emphasis added). In light of this instruction, the Court has considered all of the facts and circumstances of this case and holds that Mr. Mullins' landholding and cattle farm operation should be treated as a single activity such that any expected appreciation in the land owned by Mr. Mullins can be considered in ascertaining the existence of an intent to profit from the cattle activity.

As noted above, the Sixth Circuit in *Holmes* held that the tax court had misapplied Regulation section 1.183–2(b)(4); however, the tax court's finding that all of the taxpayers' farming activities, including

holding land, should be treated as a single activity was not disturbed. 184 F.3d at 546. According to the testimony of those taxpayers, they purchased their land with the expectation that it would increase in value and that they elected to pursue agrarian production on the land in the meantime. *Id.* Applying the fourth factor set out in Regulation section 1.183–2(b)(4), the tax court had concluded that the taxpayers failed to prove that their farming endeavors and land had "*actually* appreciated" and therefore they did not prove that they actually and honestly expected the property to appreciate at the time of purchase. *Id.* (emphasis in original). In correcting this misapplication of the fourth factor, the Sixth Circuit held that "the taxpayers needed only to prove a contemporaneous actual and honest expectation of value appreciation; they were not required to prove that a profit expectation was reasonably realistic at the time that they acquired their land, and thus *a fortiori* did not need to prove that the fortunes of time ultimately vindicated their prognostication." *Id.*

In the present case, the record reveals that Mr. Mullins' primary intention with all of his purchases of farm land was to raise beef cattle for a profit. After each purchase of farm land, Mr. Mullins spent considerable time and effort preparing the land for raising cattle. All of the improvements that he made to the land were related to farming, not to any other purpose such as recreation.

Mr. Mullins testified that he also earned substantial profits from selling his farm land or selling timber thereon. In fact, Mr. Mullins sold timber from the Andersonville Farm for $53,000 in the early 1980s; he sold the Frost Bottom Farm

for $214,000, plus $100,000 interest income, in 1990; he sold the Granite Road Farm for $50,000 in 1995; he sold the land on which the livestock auction was located for a profit in 1999; and he sold the Andersonville Farm for almost $600,000 along with interest income in 2001. Moreover, the fair market value of the Bush Farm has been appraised at $1,690,000 by Robert Fletcher.[8]

Although it is not necessary to prove *actual* appreciation in land, as established by the *Holmes* decision, the Court finds that Mr. Mullins, being the successful businessman that he is, expected that his farm land would appreciate in value when he initially purchased the property, and the evidence reveals that it did to a substantial degree. Therefore, under the fourth factor set out in Regulation section 1.183–2(b)(4), Mr. Mullins' expectation that his land would appreciate in value supports a finding that he engaged in his cattle raising activities with a profit motive. However, because Mr. Mullins did not purchase the farm land with the *primary* intent to profit from an increase in its value, the *primary* intention being to profit from cattle raising, it is irrelevant whether the farming operation produced sufficient income to reduce the net cost of holding the land.

An analysis of the sixth and seventh factors set forth in Regulation section 1.183–2(b) goes hand in hand. The sixth factor, the taxpayer's history of income or loss with respect to the activity, is explained in Regulation section 1.183–2(b)(6):

A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit.

---

**8.** Mr. Mullins' reported comment to Mr. Fletcher that one idea for the development of the Bush Farm was as a resort and golf course does not change his primary intention

in purchasing the property years ago or his expectation that the property would appreciate in value over time.

However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market conditions, such losses would not be an indication that the activity is not engaged in for profit. A series of years in which net income was realized would of course be strong evidence that the activity is engaged in for profit.

As for the seventh factor, Regulation section 1.183–2(b)(7) explains the amount of occasional profit, if any, earned:

The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's intent. An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. However, substantial profit, though only occasional, would generally be indicative that an activity is engaged in for profit, where the investment or losses are comparatively small. Moreover, an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated.

The testimonial and documentary evidence showed that Mr. Mullins earned small profits and claimed substantial losses during the twenty-four years of his cattle farm operation. Mr. Mullins recalled making a profit from cattle sales during some of the years of his cattle farm operation. During the years at issue, he did not make a profit from selling cattle. According to the records submitted by the U.S., Mr. Mullins only earned a small net profit one year and the remaining years he incurred substantial operating losses.

The Court cannot ignore the evidence that over the years the cumulative losses were substantial and the profits were small for Mr. Mullins' cattle farm operation. During the years at issue, however, the losses can be partially explained by the uncontroverted proof that there was a decline in cattle sales and that Mr. Mullins had setbacks with his health. In addition, the losses over the years become less significant when the substantial appreciation in value of Mr. Mullins' farm land over time, discussed above with respect to the fourth factor, is considered.

Although the sixth and seventh factors relating to profit and loss weigh in favor of the U.S., the Court is not convinced that such proof indicates the absence of an overall "actual and honest" intent to profit on the part of Mr. Mullins. Indeed, no one factor is determinative of a taxpayer's profit motive. *See Campbell,* 868 F.2d at 836. Moreover, the Court finds the following language from the decision in *Hoyle v. C.I.R.,* T.C. Memo 1994–592, 1994 WL 675565 (1994), to be instructive on an analysis of these factors:

Farming, especially, is an activity in which sustained losses are not unusual. Over 70 years ago, the Board of Tax Appeals stated:

If losses, or even repeated losses, were the only criterion by which farm-

ing is to be judged a business, then a large proportion of the farms of the country would be outside the pale. It is the expectation of gain, and not gain itself which is one of the factors which enter into the determination of the question. * * * [*Riker v. Commissioner*, 6 B.T.A. 890, 893 (1927).]

See also *Faulconer v. Commissioner*, 748 F.2d at 900 n. 12 ("We note parenthetically that farming is not the most profitable business in which one can be engaged.").

The eighth and ninth factors presented in Regulation section 1.183–2(b) can be analyzed together. The eighth factor, the financial status of the taxpayer, is described in Regulation section 1.183–2(b)(8) in this way:

> The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved.

The ninth factor involving elements of personal pleasure or recreation is defined under Regulation section 1.183–2(9) as follows:

> The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. On the other hand, a profit motivation may be indicated where an activity lacks any appeal other than profit. It is not, however, necessary that an activity be engaged in with the exclusive intention of deriving a profit or with the intention of maximizing profits. For example, the availability of other investments which

would yield a higher return, or which would be more likely to be profitable, is not evidence that an activity is not engaged in for profit. An activity will not be treated as not engaged in for profit merely because the taxpayer has purposes or motivations other than solely to make a profit. Also, the fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors whether or not listed in this paragraph.

The Court acknowledges that Mr. Mullins has earned substantial income from ORTE for many years, including during the years at issue. However, Mr. Mullins' success at ORTE not only justifies such income but bolsters the finding that his efforts on the cattle farm were directed towards making a profit, since he employed the same work ethic in both places and also took specific steps to reduce his time spent at ORTE in order to allow him more time to raise cattle on his farm. In addition, Mr. Mullins testified that he did not engage in cattle raising as a hobby or for recreation, and Mrs. Mullins and Terry Mullins verified this point based on their observations. Although he enjoyed seeing the fruits of his labor, Mr. Mullins explained that all farm work is labor and that he did not enjoy the actual farm work. Finally, Mr. Mullins, Mrs. Mullins, and Terry Mullins all testified that neither they nor anyone else used the farm properties for recreational purposes.

In light of this evidence from credible witnesses, the Court finds that the eighth and ninth factors set forth in Regulation section 1.183–2(b) support a finding that Mr. Mullins engaged in his cattle farming activities not as a hobby but with an intent to make a profit. The Court is persuaded

that Mr. Mullins engaged in his cattle farm operation with the requisite profit motive despite continuing to earn income from ORTE. In *Holmes*, the Sixth Circuit's quotation from another opinion is instructive on this issue: "Common sense indicates to us that rational people do not perform hard manual labor for no reason, and if the possibility that petitioners performed these labors for pleasure is eliminated the only remaining motivation is profit." 184 F.3d at 548 (citation omitted).

In sum, considering the objective facts and looking at the nine general factors set out in Treasury Regulation section 1.183–2(b)(1)–(9), the Court concludes that Mr. Mullins engaged in his cattle farm operation with an actual and honest profit motive. In reaching this conclusion, the Court has considered the arguments of the U.S. that an analysis of the nine Treasury Regulation factors do not support a finding that Mr. Mullins operated the cattle farm with a profit motivation. However, these arguments do not overcome the credible and objective testimony of numerous witnesses in favor of plaintiffs presented at the trial of this matter.

### *Conclusion*

For the reasons stated herein, the Court concludes and specifically finds that plaintiffs are entitled to the following: a refund in the amount of $18,987.28 for deductions claimed in 1995; a refund in the amount of $22,447.00 for deductions claimed in 1996; a refund in the amount of $33,122.36 for deductions claimed in 1997; and a recovery in the amount of $18,493.81 for interest paid pursuant to 26 U.S.C. § 6611. In addition, the Court finds that plaintiffs are prevailing parties within the meaning of 26 U.S.C. § 7430, and therefore they are entitled to recover reasonable administrative

9. The Court expects the parties to make every effort to agree on the amount of reasonable administrative and litigation costs, including

and litigation costs, including attorney fees. On this subject, counsel for plaintiffs are directed to file an appropriate motion consistent with the requirements of Fed. R.Civ.P. 54.[9]

Enter judgment accordingly.

### *JUDGMENT*

For the reasons set forth in the accompanying findings of fact and conclusions of law, the Court hereby enters judgment in favor of plaintiffs and against defendant in the amount of $93,050.45, which is comprised of $18,987.28 for deductions claimed in 1995, $22,447.00 for deductions claimed in 1996, $33,122.36 for deductions claimed in 1997, and $18,493.81 for interest paid pursuant to 26 U.S.C. § 6611. In addition, the Court hereby finds that plaintiffs are prevailing parties within the meaning of 26 U.S.C. § 7430, and therefore they are entitled to recover reasonable administrative and litigation costs, including attorney fees.

attorney fees. If the parties are unable to do so, the Court will adjudicate this issue after further findings.